UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X          **DOCKET NO.:**
TYRONE PHIFER
                    Plaintiff,

        -against-                                                **COMPLAINT**

COUNTY OF NASSAU, NASSAU COUNTY
POLICE DEPARTMENT, COMMISSIONER
PATRICK RYDER, SERGEANT DANIEL IMONDI,
POLICE OFFICE PATRICK MCGRATH, POLICE
OFFICER QUINN R. KNAUER, POLICE OFFICER
FOSBECK in their individual and official capacities.

                                                                ***JURY TRIAL IS DEMANDED***

                    Defendants.
-----------------------------------------------------X

        PLAINTIFF, TYRONE PHIFER by and through his attorneys, The Law Offices of Frederick

K. Brewington, as and for his Complaint against the Defendants, COUNTY OF NASSAU, NASSAU

COUNTY POLICE DEPARTMENT, COMMISSIONER PATRICK RYDER, SERGEANT

DANIEL IMONDI,  POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R.

KNAUER and POLICE OFFICER FOSBECK., in their individual and official capacities respectfully

sets forth:

                            **PRELIMINARY STATEMENT**

        1.      This is a civil action seeking monetary relief, compensatory damages, special

damages and punitive damages, disbursements, costs and fees for mental anguish, pain and suffering

brought under 42 U.S.C. § 1983, providing relief from the above-captioned Defendants' false arrest,

abuse of process, malicious prosecution, fabrication of evidence and failure to intervene committed

under color of law and depriving Plaintiff of rights secured by the Constitution, the laws of the

United States and the State of New York.

2.      Specifically, Plaintiff alleges that Defendants (collectively and individually) negligently, wantonly, recklessly, willfully, carelessly, callously,  intentionally, and/ or knowingly sought to and did engage in unlawful conduct, including false arrest, abuse of process, malicious prosecution, fabrication of evidence and failure to intervene that resulted the violation of Plaintiff's civil rights in that they suffered monetary harm, emotional harm, loss of employment, loss of earnings, psychological damage, humiliation, and damage to name and reputation  impairment of earning power, legal fees and costs, and other monetary damages and other injuries not yet fully ascertained. All acts were committed under the color of law and deprived Plaintiff of rights secured by the Constitution and laws of the United States and the State of New York.

3.      Plaintiff alleges that Defendants, collectively and individually, did deprive Plaintiff of various Constitutional rights, pursuant to the above mentioned federal statutes and causes of action by committing acts under color of law and depriving the Plaintiff of rights secured by the Constitution and laws of the State of New York, which include violations of  42 U.S.C. §1983.

4.      Plaintiff further alleges that Defendants were negligent in training, hiring and supervising the officers, thus leading to unlawful conduct, including false arrest, abuse of process, malicious prosecution, fabrication of evidence and failure to intervene that resulted in the violation of Plaintiff's civil rights in that he suffered monetary harm, emotional harm, psychological damage, humiliation, and damage to name and reputation, impairment of earning power, legal fees and costs, and other monetary damages and other injuries not yet fully ascertained.

5.      Defendants' unlawfully arrested Plaintiff TYRONE PHIFER ("Mr. Phifer") after stopping him for allegedly fitting the description of being a "black man, wearing black, with no teeth".

2

6.      On December 22, 2021 Defendants proceeded to physically harass and then assault Mr. Phifer. First Defendants engaged in blocking and limiting Plaintiff's freedom to move about unhindered and then by grabbing at his umbrella.  Then Defendants actually pulled Mr. Phifer's umbrella out of his hand and placed him in a restraining hold preventing the use of his hand, feet and body.  Defendants continued to assault Plaintiff forcing his hands behind his back, tackling him to the ground, kneeling on him, pulling him up by his arms and continually using force to subdue a man they had wrongfully stopped in the first place. Plaintiff was further seized and placed in handcuffs and spoken to like he was an animal.  Defendants' proceeded to treat Plaintiff with disrespect and disregard by attempting to manufacture a narrative that Mr. Phifer was mentally ill, which caused him immediate embarrassment and humiliation.  Thereafter, Defendants continued their violation of Plaintiff as they maliciously prosecuted Mr. Phifer on charges of Obstructing Governmental Administration and abused these criminal charges as a shield to coverup their wrongful actions as they realized that they were unlawful.

7.      Mr. Phifer was then forced to defend himself in criminal court proceedings for over ten (10) months and had to go through the criminal system, was subjected to a conditional release to probation, forced to make numerous appearances in front of a criminal District Court judge at a criminal court house.  All of his charges were finally dismissed and sealed on November 1, 2022.

## JURISDICTION AND VENUE

8.      The jurisdiction of this court is invoked under 28 U.S.C § 1331.

9.      Venue herein is proper under 28 U.S.C. § 1391(b); the cause of action arose in the Eastern District of New York, specifically, in the hamlet of Baldwin, located in Nassau County. This is the judicial district in which all the events and omissions occurred.

**PARTIES**

10.     TYRONE PHIFER is a Black and African-American man who is a citizen of the United States and a resident of the town of Hempstead located in Nassau County, State of New York.

11.      Defendant COUNTY OF NASSAU is a municipal duly constituted corporation of the State of New York existing under and by virtue of the laws of New York State, is and was the employer of the Defendants.

12.     Defendant NASSAU COUNTY POLICE DEPARTMENT is a law enforcement agency under the control of the COUNTY OF NASSAU.

13.     During all relevant times in this Complaint, Defendant PATRICK RYDER (hereinafter "COMMISSIONER RYDER", "RYDER" or "COMMISSIONER"), a white male, sued here in his official and individual capacity, was at the time of December 22, 2021 and all relevant times thereafter an employee of the Defendant COUNTY, and at all relevant times, was the Nassau County Commissioner of Police, was head decision maker for and employed to serve as such by and for the NASSAU COUNTY POLICE DEPARTMENT.  Commissioner Ryder was a state actor prior to and on December 22, 2021,  and continued to be so thereafter.

14.     Defendant SERGEANT DANIEL IMONDI is a state actor and is an employee of the NASSAU COUNTY POLICE DEPARTMENT  a law enforcement agency under the control of Defendant COUNTY OF NASSAU  duly organized and existing under and by virtue of the laws of New York State and was acting in his official capacities on December 22, 2021 when the events herein took place. Defendant Imondi is a white and/or Caucasian man.

15.     Defendant POLICE OFFICER QUINN R. KNAUER is a state actor and is an employee of the NASSAU COUNTY POLICE DEPARTMENT  a law enforcement agency under

the control of Defendant COUNTY OF NASSAU  duly organized and existing under and by virtue

of the laws of New York State and was acting in his official capacities on December 22, 2021 when

the events herein took place. Defendant Knauer is a white and/or Caucasian man.

16.     Defendant POLICE OFFICE PATRICK MCGRATH is a state actor and is an

employee of the NASSAU COUNTY POLICE DEPARTMENT  a law enforcement agency under

the control of Defendant COUNTY OF NASSAU  duly organized and existing under and by virtue

of the laws of New York State and was acting in his official capacities on December 22, 2021 when

the events herein took place. Defendant McGrath is a white and/or Caucasian man.

17.     Defendant POLICE OFFICER RICHARD J. FOSBECK is a state actor and is an

employee of the NASSAU COUNTY POLICE DEPARTMENT  a law enforcement agency under

the control of Defendant COUNTY OF NASSAU  duly organized and existing under and by virtue

of the laws of New York State and was acting in his official capacities on December 22, 2021 when

the events herein took place. Defendant Fosbeck is a white and/or Caucasian man.

## STATEMENT OF FACTS

18.     On December 22, 2021 Mr. Tyrone Phifer was under the care and treatment of his

podiatrist at Baldwin Foot Care located at 1685 Grand Ave Ste B, Baldwin, NY 11510.  The photo

below depicts both the location of Baldwin Foot Care and the scene of where Mr. Phifer was

accosted by Defendants.



19.     While leaving his podiatrist's office, Plaintiff, TYRONE PHIFER was stopped by the NASSAU COUNTY POLICE DEPARTMENT and Defendants IMONDI and FOSBECK allegedly being a person named "Leroy." Plaintiff immediately identified himself and told the officer that his name was not Leroy but was Tyrone.  The officer did not state his purpose or authority.

20.     While Defendant officers alleged the first name of the person they were looking for was "Leroy" they did not disclose the last name nor the age, height, weight, skin tone, hair length or any other distinguishing factors for the person they alleged to be Leroy.

21.     Defendant officers were actually not looking for a person named Leroy, but according to police records, the complaint lodged with police the name of the person they were allegedly looking for was named Wilfred Elwin, who was approximately 40 years old, 6 feet tall, with short hair, with a thin build, dressed all in black,  who talks to himself. Further, the claim was that the person being sought was carrying a black bag.

22.     Mr. Phifer is neither named Leroy or Wilfred Elwin.  At the time of this initial interaction with police, Plaintiff was 60 years old, was not dressed all in black, was wearing a baseball style cap, did not maintain a thin build, did not talk to himself and was not carrying a black bag.

23.     In fact, Mr. Phifer was dressed in a grey shirt, his hair was not exposed, had on a black coat and blue jeans, he was carrying two brown paper bags and an umbrella that was brand new.

24.     Initially, Defendant DANIEL IMONDI and Defendant POLICE OFFICER RICHARD J. FOSBECK detained Plaintiff and immediately disrespected Plaintiff and stated to Mr. Phifer "Let's stop the bull shit, Leroy.  You know what you did." Mr. Phifer, while being taken aback, had

no idea to what these officers were referring.  Unsure what was going on, Mr. Phifer turned around,

noticed no one else was there, and said, "who? Me?" To which the Defendants officer disrespectfully

said, "yea you!  You know you beat up the woman!"

25.     Mr Phifer explained to Defendant Fosbeck that he had the wrong guy and was not

Leroy.  The Defendants continued questioning Plaintiff using the false name and referring to Mr.

Phifer calling him by the name of  Leroy.

26.     Mr. Phifer repeatedly stated that he was not named Leroy and that he wanted to be

left alone.  His request to be left alone was ignored.

27.     Mr. Phifer wanted no contact with the police and he was fearful of them based on

their disrespectful actions, comments, tone and behavior.  Mr. Phifer attempted to walk away,

however his path and freedom to move were blocked.

28.     SERGEANT DANIEL IMONDI, who was recording the events on his body camera,

spoke to Mr. Phifer who was standing now with two officers around him[1].  Defendant Imondi,

without permission, authority or legal basis advanced toward Plaintiff and reached toward him

attempting to take Mr. Phifer's umbrella out of his hand, which also was holding two brown paper

bags, which contained medical documentation and Christmas gifts given to him by his foot doctor's

office.

29.     As Mr. Phifer stepped away and pulled back his umbrella and he asked the officers,

"what are you doing?"   Defendant Imondi then snatched the umbrella out of Plaintiff's hand and

threw it, along with his other belongings, on the ground as Defendant Fosbeck attacked Plaintiff

from the rear using force to place him in a arm bar hold which restricted Plaintiff's use of his arms

---

[1] Whether there is body camera video taken by Defendant Fosbeck is unknown to Plaintiff at this time.

and his ability to be free to control his body movements.

30.    Defendants made false statements and fabricated facts and claims in what they reported occurred.  They Officers intentionally fabricated a story and informed prosecutors that:

"[t]hey asked him to put the umbrella down and refused to comply with Sergeant Imondi's verbal commands and still refusing to give identification and now became combative and more animated with his hands. For officer's safety, Sergeant Imondi attempted to remove the umbrella from arrestee's left hand, when arrestee pulled back the umbrella, Sergeant Imondi was able to remove the umbrella from defendant's left hand, the arrestee immediately went after Sergeant Imondi..."

31.    Mr. Phifer did not give the officers permission to take his property, to physically touch him and most certainly did not agree to have his freedom and liberty restricted by these officers.

32.    As Defendant IMONDI remained in arm's reach of Plaintiff, Defendant Fosbeck continued to escalate the situation by pulling Plaintiff, TYRONE PHIFER'S arms behind his back. SERGEANT DANIEL IMONDI failed to intervene in this seizure of Plaintiff, but instead grabbed Plaintiff's belongings out of his hand while TYRONE PHIFER'S arms were pulled forcefully backwards and his body was in multiple directions.

33.    At the time of the filing of this Complaint the version of this interaction that has been revealed to Plaintiff was that which was captured on Defendant IMONDI's body camera.  This recording,  which starts off with no sound,  demonstrates that officers instigated unlawful contact and escalated the situation using force and abusing Mr. Phifer.

34.    Upon information and belief, the Defendants knew that Plaintiff was not the person they were looking for prior to him being attacked and seized by Defendants.

35.     Once the sound on the body camera of Defendant Imondi comes on,  Mr. Phifer, who was presently restrained by officers was heard saying "Give me my stuff! Look at my ID! Look at my prescription!" in an attempt to further justify that he had done nothing wrong, and to show the Defendant police officers that they were in the process of actively physically assaulting and detaining the wrong man.

36.     In fact, Defendant Imondi went into Plaintiff's pocket and removed his telephone and then picked Plaintiff's prescription off of the ground that were pulled from Plaintiff's grasp and read it.  At that point Defendants knew Mr. Phifer's identity and admitted same.  They knew that Plaintiff was not the person that they claim they were looking for, yet they continued to assault and  use force to limit Plaintiff's ability to control his own movements.

37.     When SERGEANT DANIEL IMONDI bent down and grabbed the prescription Mr. Phifer protested being abused and said "Get off of me! Get off of me! I didn't do anything! I just came out of the fucking doctor!" Defendant DANIEL IMONDI, who viewed Plaintiff's prescription, confirmed in that moment that he was who he said he was which was  "TYRONE PHIFER" and further established that Plaintiff's name was not "Leroy" or "Wilfred Elwin."

38.     POLICE OFFICER FOSBECK proceeded to pull TYRONE PHIFER backwards towards Grand Avenue while this exchange was happening, ignoring that Sergeant DANIEL IMONDI had since confirmed that TYRONE PHIFER was not "Leroy"or "Wilfred Elwin."

39.     As POLICE OFFICER FOSBECK pulled TYRONE PHIFER backwards, POLICE OFFICER FOSBECK caused TYRONE PHIFER to fall to move in a westerly direction whilst still restraining TYRONE PHIFER's arms behind his back.  As a result of the restraint and force applied to ⸀TYRONE PHIFER, he was made to fall backward directly on top of Defendant Fosbeck.

9

40.    POLICE OFFICER RICHARD J. FOSBECK and SERGEANT DANIEL IMONDI proceed to then use force to turn Mr. Phifer on his stomach into the prone position while TYRONE PHIFER continued to scream "What is going on! I didn't do anything! I had hip surgery! Why are you on me! I just walked out the fucking doctor! You have the wrong person! You have the wrong person!" to which SERGEANT DANIEL IMONDI acknowledge this fact and responded, "I understand that!". Mr. Phifer also advised the Defendant Officers that he had hip surgery and that they were hurting him by them placing him on the ground and forcing his hands behind him, putting pressure on his hip, back, neck, face and arms.

41.    Despite the admission that they had the wrong person, Defendant officers proceeded to handcuff Mr. Phifer and continue to physically restrain Mr. Phifer, forcing his body and his head (face first) to the ground placing their knees and body weight on TYRONE PHIFER. Neither Defendant Imondi nor Defendant Fosbeck or any other officers attempted to intervene to stop the other from their on going mental and physical abuse of Plaintiff.

42.    Two more Nassau County Defendant officers arrived on the scene, OFFICER QUINN R. KNAUER and OFFICER PATRICK MCGRATH.

43.    Both Officer Knauer and Officer McGrath stood by and watched and listened to what Defendants Imondi and Fosbeck were doing and failed to intervene. They failed to protect Mr. Phifer and allowed the abuse to which he was being subjected, and did so despite their obligation to ensure that Mr. Phifer's person and rights were not being violated.

44.    At the same time either or both Officer Knauer or McGrath joined in on using force in restraining the liberty of Mr. Phifer and arresting him.

45.     Defendant POLICE OFFICER DANIEL IMONDI then untruthfully and contrary to the indisputable evidence, continued to fabricate and told TYRONE PHIFER "When I tried to talk to you, you tried to swing" and TYRONE PHIFER immediately responded, stating "NO I DIDN'T!"

46.     The officers then using disrespectful language and speaking to Mr. Phifer as though he were an animal, aggressively picked Plaintiff up and then sat TYRONE PHIFER on the bench located nearest to him while an officer was heard yelling "sit him up" and telling Mr. Phifer to "sit.".

47.     The Defendant officers without cause or legal basis placed handcuffs on TYRONE PHIFER with no regard for the fact that the entire situation was wrongfully created by the carelessness, recklessness, complete disregard and incompetence of their own actions and escalation of the entire situation.

48.     Mr. Phifer continued to tell the officers: "I didn't do anything, I didn't do anything." The officers while admitting that Mr. Phifer did not do anything wrong responded "I didn't say you did Tyrone." Mr. Phifer responded to this admission by asking, "So why the fuck are you all attacking me?".

49.     POLICE OFFICER PATRICK MCGRATH then handed TYRONE PHIFER's New York State Identification card to Defendant SERGEANT DANIEL IMONDI, which again confirmed that Mr. Phifer was not the person they claimed they were looking for.

50.     Defendants FOSBECK, DANIEL IMONDI, KNAUER AND PATRICK MCGRATH had **all positively confirmed** that they had detained, tackled, assaulted, restrained, kneeled on, screamed at, handcuffed, falsely accused, intimidated, and harassed the wrong person.

51.     And yet, despite this acknowledgment, once again, the Defendants did not stop their abuse of Plaintiff.

11

52.     TYRONE PHIFER once again informed Defendants including Defendants McGrath, Imondi, Fosbeck ans Kanuer that he was not Leroy.

53.     This information was met by no response from any of the officers, just a long period of silence.

54.     Two women from the podiatrists' office (Baldwin Food Care), where TYRONE PHIFER had been for a doctor's appointment earlier that morning, came out of their office to see what was going on and attempted to gather Mr. Phifer's scattered belongings which Defendant Officer had strewn on the ground.

55.     Not only were the women's efforts met with a level of callous disregard for Mr Phifer's belongs, which include Christmas gifts which the women had just provided to Plaintiff, but POLICE OFFICER FOSBECK wrongfully stated "He's [Mr. Phifer] out of control so just step back."  This was an attempt to wrongfully justify the wrongful actions taken and to coverup Defendants treatment of TYRONE PHIFER.  These statements and directives were made to place fear in the women and to mask the abuse of the police violence, force and mistreatment in which they had engaged.  It was also an attempt to suggest that Mr. Phifer deserved to be treated this way by being tackled, restrained and detained on his way home from the doctor and that he was a danger to them.

56.     Mr. Phifer promptly told the officers that they jumped on him. To which Defendants wrongfully state that no one jumped on him.

57.     POLICE OFFICER FOSBECK went on to tell TYRONE PHIFER "You fit a description" and SERGEANT DANIEL IMONDI chimed in to say "You fit the description!" to which TYRONE PHIFER responded "so every black man fits the fucking description?".

12

58.     That was a reasonable response considering the past actions of Nassau County Police in arresting Black persons and the vague description of "black male, black outfit, no teeth" to which the officers keep referring.

59.     Based on the Nassau County Arrest Data analyzed in the chart below, Nassau County knew or reasonably should have known that its police were arresting African-American persons at a level which demonstrated race based arrests by its police department.

| NCPD Arrest Data | | | | | | | |
|---|---|---|---|---|---|---|---|
| Cohort | Asian | Black | Hispanic | Other | White | Unknwn | Total |
| Population (2017 est) | 133,666 | 152,447 | 234,881 | 32,377 | 816,143 | N/A | 1,369,514 |
| % Total Population | 9.8% | 11.1% | 17.2% | 2.4% | 59.6% | N/A | 100.0% |
| **2018 Arrests** | | | | | | | |
| Male | 402 | 4,118 | 2,805 | 253 | 4,639 | 205 | 12,422 |
| Female | 166 | 1,391 | 779 | 54 | 1,580 | 31 | 4,001 |
| Combined | 568 | 5,509 | 3,584 | 307 | 6,219 | 236 | 16,423 |
| Cohort % of Total | 3.5% | 33.5% | 21.8% | 1.9% | 37.9% | 1.4% | 100.0% |
| Cohort Frequency Rate | 0.00425 | 0.03614 | 0.01526 | 0.00948 | 0.00762 | | |
| Cohort Ratio : Whites | 0.6 | 4.7 | 2.0 | 1.2 | 1.0 | | |
| | | | | | | | |
| **2019 Arrests** | | | | | | | |
| Male | 560 | 3,839 | 2,722 | 74 | 3,893 | 14 | 11,102 |
| Female | 229 | 1,297 | 748 | 10 | 1,299 | 3 | 3,586 |
| Combined | 789 | 5,136 | 3,470 | 84 | 5,192 | 17 | 14,688 |
| Cohort % of Total | 5.4% | 35.0% | 23.6% | 0.6% | 35.3% | 0.1% | 100.0% |
| Cohort Frequency Rate | 0.00590 | 0.03369 | 0.01477 | 0.00259 | 0.00636 | | |
| Cohort Ratio : Whites | 0.9 | 5.3 | 2.3 | 0.4 | 1.0 | | |

Population data source: http://www.city-data.com/county/Nassau_County-NY.html

60.     The arrest data for the year January 2021 through December 2021[2] provides an even more concerning statistical picture as stated in the chart below.

---

[2]  Reported by Long Island United Police Accountability Working Group in their report entitled, Monitoring Police Reform in Nassau County, October 2022 which used data issued by Nassau County.

| Arrest Demographics | Male | Female | Unknown/ Other | Total | % of Total |
|---|---|---|---|---|---|
| American Indian/Alaskan Native | 26 | 4 | 0 | 30 | 0.3% |
| Asian/Pacific Islander | 471 | 134 | 0 | 605 | 5.9% |
| Black | 2,812 | 844 | 0 | 3,656 | 35.6% |
| Hispanic/ Latino | 2,054 | 523 | 0 | 2,577 | 25.1% |
| Other | 0 | 1 | 0 | 1 | 0.0% |
| Unknown | 0 | 3 | 0 | 3 | 0.0% |
| White | 2,529 | 871 | 0 | 3,400 | 33.1% |
| Total | 7,892 | 2,380 | 0 | 10,272 | 100.0% |

61.   As demonstrated by the chart above[3] the actual number of Black/African-Americans arrested in the year 2021 exceeded the number of Whites arrested despite the Black community making up only 10.6% of the Nassau County's total population.[4] For the years 2018, 2019 and 2020 the racial disparity of arrests between Blacks and Whites in Nassau County increased despite the fact of these disparities being known to Nassau County and the NCPD.

62.   In the matter of traffic stops and false arrest, upon information and belief, Black people in Nassau County are 4.2 - 5.6 times more likely to be stopped than White people. Upon information and belief, in Nassau County Latino individuals are 4.1 - 5.5 times more likely to be stopped than White people.

63.   Rather than address the clear racial disparities in traffic stops and arrests, the Commissioner of the NCPD asserted at a hearing before the Nassau County Legislature that the data from his department should be explained by his supposition that many non-white residents may be

---

[3] The chart provided is a direct copy of sections of reports issued publicly by Nassau County.

[4] According to Nassau County, the population data used was from the 2020 census.

14

entering the county and "[coming] here to commit some kind of criminal act."[5]

64.    Data clearly shows that the NCPD has failed to address its mandated requirement and stated commitment to reducing racial bias in policing.[6] Across nearly all dimensions including Arrests, Field Interviews (FI), Use of Force, and Vehicle and Traffic Law (VTL) stops, racial bias is prevalent.

65.    A careful review of the data reveals no empirical justification for relevant racial disparities.

66.    According to available data[7], in Nassau County, upon information and belief, Black people are subject to traffic stops at 3.1 times the rate of White people; Black people are subject to Terry Stops at 4.7 times the rate of White people; and Black people are subject to being frisked at 6.8 times the rate of White people.

67.    Combined, these findings provide compelling indicia of the impermissible consideration of race as a factor in discretionary enforcement actions by NCPD.

68.     POLICE OFFICER FOSBECK and POLICE OFFICER DANIEL IMONDI go on to continue to hold TYRONE PHIFER in a sitting position on the bench while also saying untruths

---

[5]      https://www.wshu.org/long-island-news/2022-02-04/nassau-police-say-non-residents-are-causing-racial-enforcement- disparity-data-suggests-otherwise

[6]  New York State Executive Order 203 was issued as a means of addressing "racially-biased law enforcement [and] to demand change, action, and accountability"16 in the wake of the murder of George Floyd.  The NCPD, in response, developed a plan that it claimed would continue "robust community-oriented policing strategies while working toward further reducing racial disparities in policing."

[7] Unlike many law enforcement agencies, including neighboring SCPD, NCPD does not provide public access to source enforcement data in delimited text digital format. That prevents meaningful interrogation of the data.  In addition, the data that NCPD did release did not include metrics by cohort for each enforcement activity. That limitation prevents calculation of cohort frequency rates.  Further, upon and information belief NCPD does not maintain, or has not made public it's data as to strip searches of person taken into custody.

such as "You were swinging around the umbrella", which Mr. Phifer adamantly denied.

69.     While SERGEANT IMONDI attempted to obtain information from Plaintiff's driver, Defendant Knauer placed his hands on Plaintiff and placed his knee with his full body weight on Plaintiff, to which Mr. Phifer immediately objected and demanded that he stop his use of force that was causing him pain and distress.

70.     Defendant POLICE OFFICER QUINN R. KNAUER and POLICE OFFICER PATRICK MCGRATH remained on the scene during this encounter, failing to intervene while the other Defendant officers continued to harass, physically restrain, abuse and wrongfully detain an older black man on his way from the doctor with no probable cause, or reasonable suspicion that he had engaged in any unlawful actions or committed any crime.

71.     All of these officers were acting in concert and  none of them held each other accountable for the physical, mental or emotional pain they were inflicting on TYRONE PHIFER.

72.     At no time did Defendants refrain from their abusive actions.  They continued to restrain Plaintiff, continued to keep him handcuffed and at no time did they apologize Mr. Phifer or loosen their grips on his person.

73.     Defendant officers did nothing to rectify their own wrong doing, violation of Plaintiff's rights or the physical abuse to which Mr. Phifer was being subjected.

74.     POLICE OFFICER QUINN KNAUER engaged in further physical abuse as he continued to use great force to hold TYRONE PHIFER down then falsely  yelled "stop spitting!" although Mr. Phifer was being forced to plead for his existence and address the deep fear he was experiencing at the hand of the Defendants who had continued to falsely imprison and deprive TYRONE PHIFER of his basic human and civil rights.

16

75.     Mr. Phifer said "I'm not spitting nothing! Get off of me!" to which Defendant POLICE OFFICER QUINN KNAUER responds "Yeah?!?" and began to forcefully pull TYRONE PHIFER'S mask over his face and ears with his left hand while holding his right hand on Mr Phifer's right shoulder and applying his full body weight.

76.     Defendant POLICE OFFICER FOSBECK and DEFENDANT POLICE OFFICER DANIEL IMONDI begin to simultaneously ask if TYRONE PHIFER is on any medication or if he has any mental health issues in another attempt to fabricate a reason for their unjust behavior.

77.     Towards the end of the recorded interaction, the transportation driver who had transported Mr. Phifer to his medical appointment earlier that morning walked up to where Mr. Phifer was being detained and asked, "Tyrone, what happened?"  Rather than admit that they had wrongfully detained, physically abused, handcuffed and arrested Mr Phifer, Defendant Imondi approached the transportation driver and repeatedly ask if TYRONE PHIFER was diagnosed with "anything".

78.     In a crystal clear effort to manufacture a story and find any reason to justify and support the assault on Mr. Phifer by the Defendant officers, Defendant Imondi went into TYRONE PHIFER'S podiatrists office and continued his quest to find a basis to justify the multiple abuses visited on Plaintiff by ask no fewer than three times if he has any mental illnesses.

79.     While Defendant Imondi received no confirmation of mental illnesses, he did  receive confirmation that TYRONE PHIFER has a disability and has issues with his hips and with walking and had to use Access-A-Ride.

80.     The questions to the transport driver and the persons at the podiatrist's office were a blatant attempt to cover up the fact that Defendant IMONDI,  POLICE OFFICERS QUINN R.

KNAUER, PATRICK MCGRATH, AND POLICE OFFICER FOSBECK just harassed, assaulted, wrongfully detained, wrongfully arrested, and falsely charged an older black man on his way home from the doctor's office.

81.     Contrary to Defendant Imondi's shallow efforts to saddle and label Mr. Phifer with mental illness and to unjustifiably try to create a condition to use against Mr Phifer and mask the unlawful and violative behavior of Defendants Officers, Mr. Phifer was not suffering from mental illness but was reasonably reacting to the abuse, mistreatment, mental assault and physical abuse which the Defendant felt they were privileged to use unjustifiably use against Plaintiff.

82.     Due to the violence to which Mr. Phifer was subjected he had to be transported to the Nassau University Medical Center (NUMC) to be treated for the pain and injuries he was suffering until approximately 8:30 p.m. on December 22, 2021.  While at NUMC Defendants continued, to no avail, to press the medical staff to find that Plaintiff was suffering from some form of mental disease or condition.

83.     Despite making the request, Mr. Phifer was denied the opportunity to make a call to his family to advise them where he was.  He was falsely detained  and thereafter subjected to multiple searches, and then was wrongfully charged on December 22, 2021 with the crime of Obstructing Governmental Administration.  After being held for 10 ½ hours, Mr.  Phifer was issued a Desk Appearance Ticket (DAT) and then unceremoniously released from the Hospital, with no apology, no ride home or further details as to why he was treated in the fashion that he was.

84.     The DAT was issued by Defendants and was flawed as it gave a return date for Plaintiff to appear in court of January 5, 2021.  The DAT was no only dated with the incorrect year, but scheduled Plaintiff to appear on a date when his arrest had not been placed in the Court computer

system. When Mr. Phifer appeared on January 5, 2022 he was told that there was not record and told to return on a later day. A copy of both sides of the DAT are included below.

**IMPORTANT:** Defendant's court appearance must be verified by the Clerk of the Court or the Police Court Liaison Office before bail may be redeemed.

**DEFENDANT APPEARED:**

_____
DATE

_____
VERIFICATION SIGNATURE

2022 JAN -5 AM 8: 41

No heard!

516-493-4201

85.     Thereafter, Plaintiff was required to appear before the Court and was arraigned and formally charge with the crime of Obstruction of Governmental Administration.   Although this charge was false and fabricated, Plaintiff was required to remain subject to the jurisdiction of the Nassau County District Court and was required to appear in Court for scheduled Court dates and had both his freedom and ability to move about as he wished restricted.

86.     Mr. Phifer, who was ably represented by attorneys from the Nassau County Legal Aide Society, continued to appear in Court to face false and fabricated charges lodged by Defendant officers and sworn to by Defendant Fosbeck in a District Court Information.   The pasted portion of the District Court Information dated December 22, 2021 stated:

To Wit: Deponent states that on the above listed date, time and place of occurrence, Deponent passes the defendant, that fit the description of a person wanted for an arrest, involving a violent domestic incident, that occurred around the corner. Defendant was standing at one of the possible known destinations, given out as a location to canvas, in a recent radio notification by Police Officers and CB operators. Deponent turned around RMP122, entered the parking lot and gave out the defendants location over the radio and attempted to interview the defendant with a Supervisor, the defendant became irate and uncooperative, refusing to give proper identification to deponents, so deponents could rule out the defendant from being involved. the defendant was asked repeatedly to comply with putting the umbrella down and then became combative, refusing to comply with the repeated verbal commands of Deponents, to stop flailing his umbrella and to put the umbrella down, for officers safety. Deponents fearing for their safety, removed the umbrella from the defendant as the defendant started to fight, he was restrained, while standing but the defendant continued to fight while being retrained and pushed the deponents backwards towards the street, causing the deponents to fall backwards onto the concrete sidewalk, with the defendant falling on top of the deponent, causing an injury to the deponents tail bone.

87.     Contrary to the allegations manufactured by Defendants, Plaintiff did not become "irate and uncooperative".   Plaintiff in fact did identify himself, to police and explained that he was just coming from his foot doctor's office, which was just feet away from this encounter.   Defendant officers continued to make demands of Plaintiff and insist that he was not who he said he was.

88.     There were never repeated requests for Plaintiff to put his umbrella down.   Nor at any time was Plaintiff "flailing his umbrella" or take any actions which created any safety concerns for the Defendant officers.

21

89.     At no time did Mr. Phifer "start to fight" or take any action which could be reasonably interpreted as physically threatening to the Defendant officers.  Instead, Plaintiff was unlawfully seized, detained, searched, restrained, pulled to the ground, mentally and physically abused.

90.     Plaintiff was required to combat the false allegations made against him and throughout the next ten (10) months maintained his innocence.  Finally, the false charges were dismissed and sealed on November 1, 2022.

91.     All as a result of this one horrific day and the unlawful and unconstitutional actions of Defendants COUNTY OF NASSAU, NASSAU COUNTY POLICE DEPARTMENT, SERGEANT DANIEL IMONDI, POLICE OFFICE PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER and  POLICE OFFICER FOSBECK.

92.     Each of the allegations contained in paragraphs 1-90 of this Complaint support the claims in each of the counts set forth below.

93. The false arrest, malicious prosecution, abuse of process, fabrication of evidence, and other acts conducted against the Plaintiff by Defendants COUNTY OF NASSAU, NASSAU COUNTY POLICE DEPARTMENT, SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, POLICE OFFICER FOSBECK, their agents, employees and servants in their individual and official capacities, were committed under color of law, customs and statutes of the State of New York.

94.     Under color of law, the Defendants COUNTY OF NASSAU, NASSAU COUNTY POLICE DEPARTMENT, SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, POLICE OFFICER FOSBECK, their agents, employees and servants in their individual and official capacities deprived Plaintiff of his

Fourteenth Amendment Rights and violated Plaintiff's right to equal protection under the laws by wrongfully detaining, arresting, assaulting and harassing Plaintiff simply for matching a vague description of "black  male". Additionally, the police officers were motivated only by malice and bias in their detention, arrest and treatment of Plaintiff.

95.    The Defendants COUNTY OF NASSAU, NASSAU COUNTY POLICE DEPARTMENT, COMMISSIONER PATRICK RYDER, SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, POLICE OFFICER FOSBECK, their agents, employees and servants in their individual and official capacities acted under color of law to falsely arrest and wrongfully detain Plaintiff for Obstruction of Governmental Administration solely as a cover-up for the fact they had knowingly mistaken Plaintiff's identity and proceeded to both instigate and escalate a situation with Plaintiff as a result of doing so. Defendants used the fabricated evidence against Plaintiff in connection with the criminal proceedings that they initiated against Mr. Phifer by way of the DAT they issued to him and the perjured sworn statements used to support the criminal complaint.

96.    As a consequence of Defendants unconstitutional and blatantly unlawful actions Plaintiff was assaulted, wrongfully detained, falsely arrested, subjected to abused process, fabricated evidence, and the Defendants failed to intervene and maliciously prosecuted Mr. Phifer.

### AS AND FOR A FIRST COUNT

### 42 U.S.C. 1983:  FABRICATION OF EVIDENCE

97.    Plaintiff repeats, reiterates, and realleges the allegations set forth in paragraphs 1 through 96 of this Complaint with the same force and effect as though fully set forth herein.

98.     Defendants SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, and POLICE OFFICER FOSBECK took an active role in creating and manufacturing the allegations made against PLAINTIFF in an intentional attempt to mask and coverup their wrongful actions and abuses of PLAINTIFF. DEFENDANTS abused the Legal system and process for their own benefit and self interest. With the complicity of COUNTY and NASSAU COUNTY POLICE DEPARTMENT, DEFENDANTS maliciously prosecuted PLAINTIFF using fabricated evidence.

99.     DEFENDANTS knew at the time of PLAINTIFF's arrest, and at all times since then, that they were not in possession of any evidence consistent with and sufficient to establish his guilt and were based solely, or in part, on DEFENDANTS' disregard and discriminatory and violative actions due in part or in whole to deprive PLAINTIFF of his right to freedom from malicious prosecution as a result of fabricated evidence furnished by DEFENDANTS.

100.    Each of the DEFENDANTS acting under color of law, acted separately and in concert and without authorization of law. Each of the DEFENDANTS, separately and in concert with each other, acted negligently, recklessly, carelessly, callously, knowingly, willfully, wantonly, intentionally, and purposefully with specific intent to deprive PLAINTIFF of his right to freedom from malicious prosecution as a result of fabricated evidence furnished by DEFENDANTS. All of these rights are secured to PLAINTIFF by the provisions of the due process clause of the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States, and by 42 U.S.C. § 1983

101.    Defendants SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, and POLICE OFFICER FOSBECK fabricated statements against Plaintiff in an attempt to cover up their own ineptitudes and create a

24

rationale for their abuse of Plaintiff and the liberty deprivation to which he was subjected. The same Defendant officer created false information, then the officers forwarded the false information to prosecutors, Defendants knew that the false information was likely to influence a jury's decision and they knew that they had the duty not to lie or persecute the innocent.

102.    The criminal allegations, which were false, formed the sole basis for Plaintiff's prosecution. As a consequence of Defendants' wrongful actions, negligent behavior, and violation of federal laws, Plaintiff was deprived of his freedom, made to suffer injuries, and subjected to great fear, terror, personal humiliation, and degradation. Plaintiff continues to suffer mental and emotional distress, as well as physical pain as a result of the aforesaid unlawful conduct of the Defendants.

103.    In doing so, Defendants acted, filed the charges, and used the those charges without excuse of justification in order to obtain a collateral objective that was outside the legitimate ends of the process and caused serious and unjustifiable harm to Mr. Phifer.

104.    That by reason of the foregoing, Plaintiff has been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## AS AND FOR A SECOND COUNT

### 42 U.S.C. 1983: FALSE ARREST

105.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1-104 of this Complaint with the same force and effect as though fully set forth herein.

106.    The accusations of the wrongful and illegal actions levied against Plaintiff TYRONE PHIFER by Defendants SERGEANT DANIEL IMONDI, POLICE OFFICE PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, POLICE OFFICER FOSBECK were false and were used as a cover up for the fact that Defendants had falsely and wrongfully detained Plaintiff based solely

on their own inability to make a proper identification even after Plaintiff had made every attempt to offer them his identification and rectify Defendants misunderstanding.

107.    The detention, restraint, assault and false arrest and other violative acts against Plaintiff by Defendants SERGEANT DANIEL IMONDI, POLICE OFFICE PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, POLICE OFFICER FOSBECK constituted a violation of Plaintiff's rights secured by the Fourteenth Amendment to the United States Constitution to equal protection under the laws. Such actions were negligent, reckless, unreasonable and unauthorized, as Defendants SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, POLICE OFFICER FOSBECK had a duty to not subject Plaintiff to wrongful detention, physical restraint, false arrest but breached that duty when they chose to do so in an attempt to cover up their own wrongful actions, violative acts and mistakes.

108.    Plaintiff TYRONE PHIFER was forced to undergo arrest for  Obstruction of Governmental Administration; a charge on which there was never any probable cause, and malice and racism was the primary purpose as Defendants SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, POLICE OFFICER FOSBECK chose to target Plaintiff for fitting a vague description of "black male".

109.    The charges against Plaintiff TYRONE PHIFER were dismissed and sealed.

110.    As a consequence of Defendants' wrongful actions, negligent behavior, and violation of federal laws, Plaintiff was deprived of his freedom, made to suffer injuries, and subjected to great fear, terror, personal humiliation, and degradation. Plaintiff continues to suffer mental and emotional distress, as well as physical pain as a result of the aforesaid unlawful conduct of the Defendants.

111.    In doing so, Defendants caused serious and unjustifiable harm to Mr. Phifer.

112.    That by reason of the foregoing, Plaintiff has been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## AS AND FOR A THIRD CAUSE OF ACTION

### 42 U.S.C. 1983: MALICIOUS PROSECUTION

113.    The Plaintiff repeats reiterates and realleges each and every allegation contained in paragraphs 1 through 112 of this Complaint with the same force and effect as though fully set forth herein.

114.    Defendants SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, and POLICE OFFICER FOSBECK instituted a criminal proceeding wrongfully charging Plaintiff with Obstructing Governmental Administration.

115.    There was no probable cause to arrest or charge Plaintiff TYRONE PHIFER as he was leaving his podiatrist office and the SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, POLICE OFFICER FOSBECK approached him and wrongfully identified him as a suspect, and then refused to stop instigating and escalating the situation when proven wrong.

116.    There was no purpose other than covering up their wrongful actions when charging Plaintiff with Obstructing Governmental Administration.

117.    Plaintiff suffered irrevocable harm because he was arrested, arraigned, and prosecuted.

118.     As a consequence of Defendants' wrongful actions, negligent behavior, and violation of federal laws, Plaintiff was deprived of his freedom, made to suffer injuries, and subjected to great fear, terror, personal humiliation, and degradation.  Plaintiff continues to suffer mental and emotional distress, as well as physical pain as a result of the aforesaid unlawful conduct of the Defendants.

119.     In doing so, Defendants caused serious and unjustifiable harm to Mr. Phifer.

120.     That by reason of the foregoing, Plaintiff has been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

### AS AND FOR A FOURTH COUNT

### 42 U.S.C. 1983: ABUSE OF PROCESS

121.     The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1- 120 of this Complaint with the same force and effect as though fully set forth herein.

122.     Defendants   SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, and POLICE OFFICER FOSBECK intentionally, recklessly, and maliciously filed and/or caused to be filed, a false, inaccurate, and/or misleading criminal complaint against Plaintiff TYRONE PHIFER.

123.     The false criminal complaint pushed forth by Defendants SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, and POLICE OFFICER FOSBECK was done as a result of Defendants' attempt to cover up the fact they wrongfully identified Plaintiff TYRONE PHIFER as a suspect based on his race alone and then escalated the situation and fabricated evidence in order to make it seem as though they had a purpose other than malice and animus for continuing to instigate an interaction with Plaintiff.

28

124.     Defendants SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, and POLICE OFFICER FOSBECK use of criminal process for the purpose of covering up their own incompetence and inability to investigate without any probable cause or reasonable belief in criminal or statutory violations, amounts to an abuse of the criminal process which was initiated and used to the detriment of Plaintiff and solely for the illegitimate purpose of harassing and embarrassing Plaintiff causing him financial and emotional hardship.

125.     The false arrest and malicious prosecution of Plaintiff SERGEANT DANIEL IMONDI, POLICE OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, and POLICE OFFICER FOSBECK with knowledge that the facts contained in their criminal complaint were false, misleading and otherwise inaccurate. The use of this criminal process was intended to punish Plaintiff for stating he would sue the Defendants, to protect them from discipline, to protect them from the loss of their employment and to cause Plaintiff financial and social harm. The ulterior or collateral purposes included teaching Plaintiff a lesson for refusing to be abused and to infliction of economic harm and exact retribution from Plaintiff for his exercise of his refusal to be racially profiled and him stating so.

126. As a consequence Plaintiff TYRONE PHIFER was falsely arrested and maliciously prosecuted due to Defendants willful, and intentional acts done to harm Plaintiff, to deprive him of his rights, and cover up the wrongful acts and abuse to which Plaintiff was subjected.

127.     As a consequence of Defendants' wrongful actions, negligent behavior, and violation of federal laws, Plaintiff was deprived of his freedom, made to suffer injuries, and subjected to great fear, terror, personal humiliation, and degradation. Plaintiff continues to suffer mental and emotional

distress, as well as physical pain as a result of the aforesaid unlawful conduct of the Defendants.

128.    In doing so, Defendants caused serious and unjustifiable harm to Mr. Phifer.

129.    That by reason of the foregoing, Plaintiff has been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## AS AND FOR A FIFTH COUNT

### 42 U.S.C. 1983: FAILURE TO INTERVENE

130.    The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1- 129 of this Complaint with the same force and effect as though fully set forth herein.

131.    Defendants  SERGEANT  DANIEL  IMONDI,  POLICE  OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, and POLICE OFFICER FOSBECK violated Plaintiff TYRONE PHIFER constitutional right to equal protection under the laws protected by the Fourteenth Amendment to the Constitution of the United States.

132.    Defendants  SERGEANT  DANIEL  IMONDI,  POLICE  OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, and POLICE OFFICER FOSBECK had a duty to intervene and had a reasonable opportunity to intervene and stop their fellow officers from assaulting, battering, wrongfully detaining and falsely arresting Plaintiff TYRONE PHIFER.

133.    Defendants  SERGEANT  DANIEL  IMONDI,  POLICE  OFFICER PATRICK MCGRATH, POLICE OFFICER QUINN R. KNAUER, and POLICE OFFICER FOSBECK were all individually aware that they had detained the wrong suspect and that Plaintiff TYRONE PHIFER was not the person they were looking for and proceeded to tackle Plaintiff, handcuff plaintiff, falsely arrest Plaintiff, fabricate evidence against Plaintiff and did so without ever intervening to stop their fellow officers from violating Plaintiff TYRONE PHIFER'S Fourteenth Amendment right simply

for fitting the description of being a "black male".

134.    As a consequence Plaintiff TYRONE PHIFER was falsely arrested, maliciously prosecuted and forced to attend numerous court proceedings. Additionally, he was assaulted, battered and publicly humiliated.

135.    As a consequence of Defendants' wrongful actions, negligent behavior, and violation of federal laws, Plaintiff was deprived of his freedom, made to suffer injuries, and subjected to great fear, terror, personal humiliation, and degradation.  Plaintiff continues to suffer mental and emotional distress, as well as physical pain as a result of the aforesaid unlawful conduct of the Defendants.

136.    In doing so, Defendants caused serious and unjustifiable harm to Mr. Phifer.

137.    That by reason of the foregoing, Plaintiff has been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

**AS AND FOR A SIXTH COUNT**

**42 U.S.C. 1983: MUNICIPAL LIABILITY**

138.    Plaintiff repeats and reiterates the allegations set forth in paragraphs 1- 137 of this Complaint with the same force and effect as if the same were fully set forth herein.

139.    By actively inflicting, and failing to prevent, the above stated abuses incurred by Plaintiff, all of the Defendants acted unreasonably, recklessly, and negligently in failing to exercise the slightest amount of due care to secure and protect the civil and constitutional rights of the Plaintiff against physical abuse, detained custody and other due process violations. Said rights are guaranteed to the Plaintiff by 42 U.S.C. § 1983, and by the Fourteenth Amendment of the United States Constitution.

140.    Both before and after December 22, 2021 NASSAU COUNTY and Defendants RYDER and NASSAU COUNTY POLICE DEPARTMENT have systematically failed to identify the improper abuse, misuse, and violative acts by police officers and officials, while further failing to subject such officers and officials to discipline, closer supervision, and/or restraint.

141.    Upon information and belief, regarding all Defendants, the misconduct review process includes but is not limited to the following:

> a.    Preparing reports regarding investigations of unwarranted incidents as routine point-by-point justification of the police officers actions regardless of whether such actions are justified;

> b.    Police officers investigating unwarranted incidents systematically fail to credit testimony by non-police officer witnesses and uncritically rely on reports by police officers involved in the incident;

> c.    Police officers investigating unwarranted incidents fail to include in their reports relevant factual information which would tend to contradict the statements of the police officer involved;

> d.    Supervisory police officers exonerate police officers for misconduct and abuse of process before the investigation of the incident by the police department has been completed;

> e.    Reports in brutality cases are not reviewed for accuracy by supervisory officers.  Conclusions are frequently permitted to be drawn on the basis of clearly incorrect or contradictory information.

> f.    The County of Nassau hastily accepts the allegations of police in light of clear evidence of civilians' innocence, and accepts the allegations as provided  from police reports regarding excuses for abuses and civil rights infringements, despite strong evidence to suggest that the police reports are inaccurate, untruthful, and meant to conceal blatant police misconduct.

142.    The foregoing acts, omissions, systemic flaws, policies and customs of Defendants NASSAU COUNTY, RYDER and NASSAU COUNTY POLICE DEPARTMENT encouraged and

condoned Defendants SERGEANT DANIEL IMONDI, POLICE OFFICERS QUINN R. KNAUER, PATRICK MCGRATH. AND OFFICER FOSBECK to believe that brutality and other improper actions would not be aggressively, honestly and properly investigated, with the foreseeable result that officers are most likely to use excessive force in situations where such force is neither necessary nor reasonable.

143.    Defendant Nassau County and its Police Commissioner, Defendant Patrick Ryder, who is the decision maker and policy setter and the highest ranking police official in the NCPD has consistently refused to address the data and proof in Nassau that shows racial disparities in how policing is carried out in Nassau County.

144.    Data compiled by New York State Division of Criminal Justice Services (DCJS) indicate an unbroken pattern of NCPD disproportionately arresting Black adults for NYS PL § 195.05 Obstructing Governmental Administration.

145.    On the basis of adult residential population, as codified by the U.S. Census Bureau as Citizen Voting Age Population, NCPD consistently arrests Black adults at extraordinarily disproportionate rates compared to white adults.

146.    In 2015, NCPD arrested Black adults for Obstructing Governmental Administration at more than ten times the rate of white adults. In 2023, that disparity increased to 18.8, which is nearly nineteen times the rate of white of adults.  The Chart below details those disparities.

| NCPD Adult Arrests for NYS PL § 195.05 Obstructing Governmental Administration | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Source: https://www.criminaljustice.ny.gov/crimnet/ojsa/tableau_Adult_Arrest_Agency.htm | | | | | | | | |
| Year | Metric | Black | Latino | Other | White | Comparative Analysis | | | |
| | | | | | | % Difference | | Ratio | |
| | | | | | | B : W | L : W | B : W | L : W |
| 2019 | Population | 110,515 | 112,765 | 90,765 | 651,925 | | | | |
| | Arrests | 21 | 6 | 4 | 13 | | | | |
| | Frequency | 0.00019 | 0.00005 | 0.00004 | 0.00002 | 852.9 | 166.8 | 9.5 | 2.7 |
| 2020 | Population | 112,090 | 119,045 | 95,730 | 644,105 | | | | |
| | Arrests | 7 | 5 | 1 | 7 | | | | |
| | Frequency | 0.00006 | 0.00004 | 0.00001 | 0.00001 | 474.6 | 286.5 | 5.7 | 3.9 |
| 2021 | Population | 115,855 | 124,980 | 102,130 | 655,575 | | | | |
| | Arrests | 12 | 6 | 2 | 10 | | | | |
| | Frequency | 0.00010 | 0.00005 | 0.00002 | 0.00002 | 579.0 | 214.7 | 6.8 | 3.1 |
| 2022 | Population | 119,425 | 129,840 | 110,265 | 642,090 | | | | |
| | Arrests | 20 | 9 | 0 | 13 | | | | |
| | Frequency | 0.00017 | 0.00007 | 0.00000 | 0.00002 | 727.2 | 242.4 | 8.3 | 3.4 |
| 2023 | Population | 119,425 | 129,840 | 110,265 | 642,090 | | | | |
| | Arrests | 21 | 4 | 1 | 6 | | | | |
| | Frequency | 0.00018 | 0.00003 | 0.00001 | 0.00001 | 1,781.8 | 229.7 | 18.8 | 3.3 |
| Population data: U.S. Census Bureau Citizen Voting Age Population (CVAP).  2023 CVAP not yet available. | | | | | | | | |
| https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html | | | | | | | | |

147.    Pursuant to NYS Executive Law §837-t, effective July 11, 2019, all local police departments in NYS are required to report Use of Force incidents to NYS Division of Criminal Justice Services (DCJS).

148.    DCJS has provided public access to use of force data reported by Nassau County Police Department for the period November 4, 2020 through December 30, 2022. The data indicates that, on the basis of adult residential population, NCPD used force against Black people at 6.9 times the rate of white people during that reporting period.

149.    The chart below displays the Nassau County Police Department's use of force data compiled by the State of New York for the period November 4, 2020 through December 30, 2022.

**NCPD Use of Force Data Compiled by NYS DCJS (November 4, 2020 through December 20, 2022)**

*Source:* https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.criminaljustice.ny.gov%2Fcrimnet%2Fojsa%2FUOF%2520Case%2520Level%2520File%25202023.xlsx&wdOrigin=BROWSELINK

| Period | Metric | Black | Latino | Other | White | Comparative Analysis | | | |
|--------|--------|-------|--------|-------|-------|-------|-------|-------|-------|
| | | | | | | % Difference | | Ratio | |
| | | | | | | B : W | L : W | B : W | L : W |
| 11/4/2020 through 12/30/2022 | Population (est). | 115,855 | 124,980 | 655,575 | 655,575 | | | | |
| | Force Used | 244 | 106 | 1 | 200 | | | | |
| | Frequency | 0.0021 | 0.0008 | 0.0000 | 0.0003 | 590.3 | 178.0 | 6.9 | 2.8 |

150.     NCPD Arrest Data for January 2022 to June 2022 shows a disparity that continues. Arrest data posted by NCPD reveals that despite the number of Black and Latino persons in the overall population the Nassau County Police Department has maintained a pattern of disparate law enforcement against the Black and Latino community. The following information provided in chart form below is taken from 'NCPD  Get the data' and was publicly disclosed in an article entitled "***Nassau County police blame malls for racially disproportionate arrests***", issued by WSHU and written by Charles Lane, and published November 23, 2022 at 2:08 PM EST.

| Race category | 2020 Census | Arrests | Arrest % |
|---------------|-------------|---------|----------|
| American Indian | | 19 | 0% |
| Asian | 12% | 348 | 6% |
| Black | 11% | 1,980 | 35% |
| Hispanic/Latino | 18% | 1,419 | 25% |
| Other | 4% | 2 | 0% |
| Unknown | | 1 | 0% |
| White | 56% | 1,854 | 33% |

151.    In that article it was reported that Commissioner Ryder "*told lawmakers that non-Nassau residents are coming to the county's malls, including the Westbury and Roosevelt Field malls. 'Uniondale has the large Walmart and supermarket where we have a lot of arrests,' Ryder said. 'Valley Stream has the Green Acres Mall where again, these are our initiatives.' However, the department's data shows greater disparities that Ryder did not explain. For example, Black people were disproportionately subjected to more field interviews. For Black and Hispanic people, 28% of these interviews lead to searches as opposed to just 20% of white people.*"[8]

152.    In the article entitled, ***"Black people and Latinos in Nassau arrested at significantly higher rates than whites despite police reform, community advocates say***" issued by Newsday on October 10, 2023 and written by Michael O'Keeffe, Newsday reported that "Nassau police arrested Black people and Latinos at significantly higher rates than white people in 2022, more than a year after county legislators approved a reform plan aimed at reducing racial disparities in policing, according to a report released Tuesday by a community advocacy organization."[9]

153.    What has been displayed by the County of Nassau and Ryder is a callous disregard for inequities with regard to the treatment of Black and Hispanics that are supported by the data known to them in the areas of arrests, traffic stops, misdemeanor charges, felony charges, searches, auto searches,  field interviews, and use of force.

---

[8]

https://ww.wshu.org/long-island-news/2022-11-23/nassau-county-police-blame-malls-for-racially-disproportionate-arrests

[9]https://www.newsday.com/long-island/crime/nassau-police-stops-blacks-latinos-reform-ck4mcocr

154.    In fact, Commissioner Ryder has made race based and racially insensitive comments that show his own bias and unwillingness to recognize or address the failures of Nassau County and the NCPD or to take any meaningful actions to address the concerns demonstrated by the data.

155.    In a news story entitled '***Nassau Police Say "Non-Residents" Are Causing Racial Disparity In Enforcement — Data Suggest Otherwise***' published by the Gothamist on February 4, 2022 and written by Charles Lane, Commissioner Ryder stated that the racial disparities in the arrest numbers in Nassau County were due to people coming from New York City to Nassau.[10]

156.    Commissioner Ryder was questioned on the record during police reform hearings on March 21, 2021. During his presentation, Commissioner Ryder refused to acknowledge the problems with the fact that the NCPD's own data showed a 5.3:1.0 Black-to-white arrest disparity, which is concerning enough to require at least an examination to address the racial issues raised by these numbers. Nor did Commissioner Ryder or the Nassau County Executive respond to written inquires made to them asking them to address this racial disparity.

157.    Unfortunately, Commissioner Ryder is alleged to have made even more troublesome statements in the past. As reported by Gothamist, "[a] retired officer[] said in a sworn deposition taken October 25[, 2021,] that in 2015, when [the officer] was still on the force and Ryder was a sergeant, Ryder referred to a then-police officer Dolores Sharpe [a Black female] as an '(expletive) N-word.'"

158.    After news outlets reported on this deposition testimony, and after a coalition of civil rights and police organizations called for Commission Ryder to resign, the Nassau Legislature

_____

[10]https://gothamist.com/news/nassau-police-say-non-residents-are-causing-racial-disparity -in-enforcement-data-suggest-otherwise

approved a $650,000 offer of judgment to Ms. Sharpe, who accepted the offer after years of litigating her federal race discrimination lawsuit.

159.   As Gothamist further explained, "[l]ater in the deposition, [the officer] was asked if he reported Commissioner Ryder's use of the slur to the department. [The officer] answered that he did not. 'I was basically in fear that if I reported it, retribution would follow.'"

160.   Indeed, as Gothamist further explained, "Ryder, who was a sergeant at the time, would be promoted to assistant commissioner the following year. He was named acting commissioner in 2017, and confirmed as commissioner in 2018."

161.   Nassau County has engaged in and allowed a systemic practice of racial discrimination and profiling of Black and Hispanic persons in its traffic stop, arrests and unlawful searches.  This pattern and practice has been known to and disregarded by the County of Nassau despite them being confronted with it by their own numbers through their reporting and it being pointed out by Legislative sources and community members verbally and in writing.

162.   As a direct and proximate result of the aforesaid acts, omissions, systemic flaws, policies, practices and customs of Defendants NASSAU COUNTY and NASSAU COUNTY POLICE DEPARTMENT AND POLICE OFFICERS DANIEL IMONDI, QUINN R. KNAUER, PATRICK MCGRATH, AND OFFICER FOSBECK, unjustifiably detained, assaulted and arrested Plaintiff, all in violation of his civil and constitutional rights. Plaintiff was seriously injured, subjected to great fear, terror, personal humiliation and degradation, and suffered and continues to suffer economic loss, mental and emotional distress, as a result of the aforesaid unlawful conduct of Defendants. This is an ongoing pattern of behavior adopted and condoned by Defendants

SERGEANT DANIEL IMONDI, POLICE OFFICERS QUINN R. KNAUER, PATRICK MCGRATH, AND OFFICER FOSBECK.

163. Defendants NASSAU COUNTY, RYDER and NASSAU COUNTY POLICE DEPARTMENT were reckless, careless, intentional, negligent, and/or deliberately indifferent in the training, hiring, administration, discipline and supervision of the police officers, including Defendants SERGEANT DANIEL IMONDI, POLICE OFFICERS QUINN R. KNAUER, PATRICK MCGRATH, AND OFFICER FOSBECK, with respect to the wrongful detention and false arrest imposed upon Plaintiff and the lack of intervention when fellow officers utilize unlawful police powers upon citizens, civilians, residents and non-residents.

164. THE COUNTY and RYDER have failed to employ a system which would allow findings from civilian complaints made against police OFFICERS which lead to determination of founded or validate the civilian complaints in anyway.

165. In 2021, following the murder of George Floyd on May 25, 2020 Govern Andrew Cuomo issued his Executive Order 203 (EO 203), which reminded many, and instructed the County of Nassau and other municipalities that oversaw police activity, law enforcement and policing services to the People of the State of New York giving the following unequivocal directives:

Each local government entity which has a police agency operating with police officers as defined under 1.20 of the criminal procedure law must **perform a comprehensive review of current police force deployments, strategies, policies, procedures, and practices, and develop a plan to improve such deployments, strategies, policies, procedures, and practices, for the purposes of addressing the particular needs of the communities served by such police agency and promote community engagement to foster trust, fairness, and legitimacy, and to address any racial bias and disproportionate policing of communities of color.**

**Each chief executive of such local government shall convene the head of the local police agency, and stakeholders in the community to develop such plan, which shall**

**consider evidence-based policing strategies**, including but not limited to, use of force policies, procedural justice; any studies addressing systemic racial bias or racial justice in policing; implicit bias awareness training; de-escalation training and practices; law enforcement assisted diversion programs; restorative justice practices; community-based outreach and conflict resolution; problem-oriented policing; hot spots policing; focused deterrence; crime prevention through environmental design; violence prevention and reduction interventions; model policies and guidelines promulgated by the New York State Municipal Police Training Council; and standards promulgated by the New York State Law Enforcement Accreditation Program. (Executive Order 203) https://www.governor.ny.gov/news/no-203-new-york-state-police-reform-and-reinventi on-collaborative (Emphasis added)

166.    On January 7, 2021, Nassau County appeared before the Public Safety Committee and unexpectedly released a document called "Police Reform" that was never shown, discussed, shared or disclosed to the civilian community stakeholders who made up the very bodies that were created to work collaboratively and formulate a plan.

167.    Within the 310-page document, the only part of the document which discussed programs and practices were found in the first 57 pages. Curiously, within those first 57 pages, the vast majority includes no reform proposals, instead they focus on reviewing existing policies and procedures.

168.    As a result of both this breach of trust and Nassau County's submission of a non-collaborative inadequate reform document, large numbers of the civilian members of Nassau County's police reform task forces, the PACT and CCT, resigned and turned their time, resources and talents to work on The People's Plan to guide, inform and transform the methods by which police departments, agencies and personnel engage the public as they perform their duty.

169.    The County of Nassau and the Nassau County Police Department continues to laud itself and reference implemented policies claimed to impact systemic racism all without ever acknowledging that systemic racism exists within the Nassau County Police Department.

170.    As reported in the People's Plan[11], issued on 02/19/2021, Nassau County Police failed to implement or demonstrate an effective or meaningful policy and complaint process or course of action to evaluate, and address acts of police misconduct:

"Current civilian complaint data is incredible and unsupported by actual case history, complaint accounts and data. The purported Reporting Data indicates that for the years 2016, 2017, 2018, 2019, and 2020, 0% of the complaints were for Excessive Force, 0% were for Racial Ethnic Bias, and 0% were for false arrest. This is particularly disturbing given that the more recently published 2020 Use of Force Reporting and Findings acknowledges that 85.2% of the Use of Force Circumstances resulted in arrest. It seems unlikely that there would be so few complaints, but for the fact that the existing complaint process is inaccessible.

171.    The leadership of the Nassau County Police Department, and specifically Patrick Ryder, has created a culture in its police department that is accepting of the mistreatment and refusal to address the stark realities that their own numbers demonstrate.

172.    Therefore the COUNTY and RYDER are liable under 42 U.S.C. § 1983 because the COUNTY has had actual and/or constructive knowledge of the patterns of abuse against civilians by NASSAU COUNTY POLICE DEPARTMENT Officers, employees, and/or agents in violation of the United States Constitution.

173.    Because of the COUNTY, RYDER and NASSAU COUNTY POLICE DEPARTMENT's weightless policy and custom for reviewing complaints of misconduct against the Defendants SERGEANT DANIEL IMONDI, POLICE OFFICERS QUINN R. KNAUER, PATRICK MCGRATH, AND OFFICER FOSBECK relied upon that flawed policy to continue their

---

[11]

The People's Plan: Reimagining Policing & Public Safety on Long Island (hereinafter "The People's Plan") was issued by Long Island United to Transform Policing & Community Safety (LIUTPCS), Long Island Advocates for Police Accountability (LIAFPA), United for Justice in Policing Long Island (UJPLI) and their members and constituent groups. It is the collaborative effort of community volunteers who have sacrificed countless hours in pursuit of meaningful and long-lasting change in Policing on Long Island and in particular Nassau County.

patterns of physical and mental abuse, and discriminatory, ungrounded legal enforcement in violation of the Plaintiff's rights.

174.   The COUNTY , RYDER and NASSAU COUNTY POLICE DEPARTMENT have maintained a system of review of unjustified abuses, unconstitutional actions and inactions by Police Officers including encouraging criminal behavior, that has failed to identify the improper and callous conduct of Police Officers and failed to subject NASSAU COUNTY POLICE DEPARTMENT Officers who abused citizens to discipline, closer supervision, and/or restraint to the extent that it has become the custom of the COUNTY to tolerate the improper abuses, subjective policing, arbitrary enforcement of laws, encouragement of criminal behavior, beatings, illegal arrests and other wrongful actions and inactions by NASSAU COUNTY POLICE DEPARTMENT Officers.

175.   When the community reports being subjected to wrongful actions at the hands of Defendant NASSAU COUNTY POLICE DEPARTMENT and an internal investigation is conducted by Defendants upon themselves, very little has been implemented to change, check or curb the unwarranted mental and physical abuses inflicted upon citizens by the Police Officers of NASSAU COUNTY POLICE DEPARTMENT.

176.   Defendants COUNTY and RYDER have failed to respond to the continuing and urgent need to prevent, restrain, and discipline police officers who wrongfully, abuse authority, and abuse civilians, and Defendants COUNTY and RYDER have failed to find that civilian complaints made against police officers are founded or valid in any way. Therefore, Defendant COUNTY and RYDER are liable under 42 U.S.C. §1983 because the Defendant COUNTY and RYDER have had actual and/or constructive knowledge of the patterns of abuse, failure to intervene and other disparate treatment against citizens by its police officers, employees, and/or agents in violation of the United

42

State Constitution, and because of the Defendant COUNTY'S, Defendant RYDER's and Defendant NASSAU COUNTY POLICE DEPARTMENT's un-meaningful policy and custom for reviewing complaints of misconduct against its Officers, the Defendant SERGEANT DANIEL IMONDI, POLICE OFFICERS QUINN R. KNAUER, PATRICK MCGRATH, AND OFFICER FOSBECK relied upon that flawed policy to continue the patterns of their abusive authority, physical abuse, excessive force, and false arrests, all in violation of Plaintiff's rights.

177.    The foregoing acts, omissions, systemic flaws, policies and customs of Defendants COUNTY, RYDER and NASSAU COUNTY POLICE DEPARTMENT caused the Defendant POLICE OFFICERS DANIEL IMONDI, QUINN R. KNAUER, PATRICK MCGRATH, AND OFFICER FOSBECK to believe that discriminatory abuses including exacerbating an already violent circumstance and selective enforcement of laws and other improper actions would not be aggressively, honestly and properly investigated, with the foreseeable result that OFFICERS are most likely to abuse a process where there are no repercussions for their illegal acts and omissions.

178.    As a direct and proximate result of the aforesaid acts, omissions, systemic flaws, policies, practices and customs of the Defendants COUNTY, RYDER and NASSAU COUNTY POLICE DEPARTMENT, and SERGEANT DANIEL IMONDI, POLICE OFFICERS QUINN R. KNAUER, PATRICK MCGRATH, AND OFFICER FOSBECK, collective Defendants unjustifiably allowed, encouraged and condoned the abuses, assault, harassment and false arrest of Plaintiff, in violation of his civil and constitutional rights. Plaintiff has suffered and continues to suffer from economic injury, psychological harm, mental distress, humiliation, embarrassment, fear and being prevented from attending to their usual duties and life as citizens in the manner they were preceding these incidents.

179.     Defendants COUNTY, RYDER and NASSAU COUNTY POLICE DEPARTMENT were reckless, careless, intentional, negligent, and/or deliberately indifferent in the training, hiring, administration and supervision of SERGEANT DANIEL IMONDI,  POLICE OFFICERS QUINN R. KNAUER, PATRICK MCGRATH, AND OFFICER FOSBECK with respect to the active and tacit encouragement of the continuation of the violence, abuses, assault, harassment, false arrest and lack of intervention and protection of Plaintiff.

180.     As a consequence of the Defendants' systemic practice, pattern, and custom of intentionally promoting and supporting officers' and official violations of 42 U.S.C. § 1983, Plaintiff was deprived of his freedom and physically and emotionally harmed.

181.     As a consequence of Defendants' wrongful actions, negligent behavior, and violation of federal laws, Plaintiff was deprived of his freedom, made to suffer injuries, and subjected to great fear, terror, personal humiliation, and degradation.  Plaintiff continues to suffer mental and emotional distress, as well as physical pain as a result of the aforesaid unlawful conduct of the Defendants.  The complaint process continues to skew the facts and serves to misinform the public of the racial inequities being created by the actions in arrests, investigations and findings on complaints made by civilians as to the wrongful and violative acts of members of the Nassau County Police Department.

182.     In doing so, Defendants caused serious and unjustifiable harm to Mr. Phifer and allowed those officers that abused him to feel free to do so and then manufacture a story to cover their wrongful and unlawful actions.

183.     That by reason of the foregoing, Plaintiff has been damaged in a sum greater than five million ($5,000,000.00) dollars, as well as punitive damages, costs, and attorney's fees.

## DAMAGES AND RELIEF

**WHEREFORE**, the Plaintiff each request the following damages and relief:

a.     On the First Count in excess of the sum of five million  ($5,000,000 ) dollars;

b.     On the Second Count in excess of the sum of five million  ($5,000,000 ) dollars;

c.     On the Third Count in excess of the sum of five million  ($5,000,000 )dollars;

d.     On the Fourth Count in excess of the sum of five million  ($5,000,000 ) dollars;

e.     On the Fifth Count in excess of the sum of five million ($5,000,000) dollars;

f.     On the Sixth Count in excess of the sum of five million ($5,000,000) dollars;

g.     Compensatory and Punitive damages,  as outlined  in the aforementioned paragraphs and counts, as well as costs and attorneys fees pursuant to 42 U.S.C. § 1988, and as otherwise allowed by law; and,

h.     Injunctive relief, requiring Defendants to correct all past violations of federal and state law as alleged herein; to enjoin Defendants from continuing to violate federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws;

i.     Any and all other relief this Court deems appropriate and just.

### *JURY TRIAL DEMANDED*

Dated:  Hempstead, New York
       September 11, 2024                    Respectfully submitted,

                                LAW OFFICES OF
                                FREDERICK K. BREWINGTON

              By:     *Frederick K. Brewington*
                                FREDERICK K. BREWINGTON
                                *Attorneys for Plaintiff*
                                556 Peninsula Boulevard
                                Hempstead, NY  11550
                                (516) 489-6959